UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
  LUIS F. PENA-BARRERO,

                              Plaintiff,

                 -against-

  THE CITY OF NEW YORK, KEITH KERMAN,
  STEVE WEIR, FRANK DAZZO,

                          Defendants.
------------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED:___3/30/17___ |

14-CV-9550 (VEC)

MEMORANDUM
OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

      Plaintiff Luis Pena-Barrero, a former provisional employee of the New York City

Department of Citywide Administrative Services ("DCAS"), brings this suit against his former

employers, the City of New York, Keith Kerman, Steve Weir, and Frank Dazzo (collectively,

"Defendants").  Plaintiff alleges that Defendants discriminated against him—and ultimately

terminated him—on the basis of his race, national origin, and disability and retaliated against

him for complaining about discrimination and for exercising his rights under the Family Medical

Leave Act.[1]  Defendants' motion for summary judgment is GRANTED, and the case is

DISMISSED.

## BACKGROUND

      Plaintiff was a difficult employee who was hypersensitive to criticism, who had

significant attendance issues, who wasted time and resources, and who never took the necessary

civil service test for his position; he also is an Hispanic of Colombian heritage who has a

---

[1]     Plaintiff asserts violations of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, 42 U.S.C. §
1983, the Family and Medical Leave Act, 29 U.S.C. § 2610 *et seq.* ("FMLA"), New York State Human Rights Law,
N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"), and New York City Human Rights Law, N.Y.C. Admin. Code § 8-107
*et seq.* ("NYCHRL").

disability.  This case presents the question—in broad brush—why he was terminated from his job.  As explained more fully below, Plaintiff has failed to adduce evidence that creates a genuine dispute of material fact regarding whether discrimination or retaliation played a role in his termination and whether he was subjected to a hostile work environment.

### A.  Plaintiff's Protected Characteristics and Employment with the City

Plaintiff is an Hispanic male of Colombian national origin.  Pl. 56.1 Stmt. ¶ 3.[2]  In 1997, he was diagnosed with Bipolar Affective Disorder, and he began taking medication that generated side effects that interfered with daily living.  *Id.* ¶ 9.  Plaintiff has on occasion been hospitalized on account of his Bipolar Affective Disorder.  Defs. 56.1 Stmt. Response ¶ 114.

Plaintiff began his employment with the City of New York on March 29, 1994, and held a variety of positions.  Pl. 56.1 Stmt. ¶¶ 6-8, 10-12.  From 2001 to 2011, Plaintiff worked in the Information Technology Management Information Systems Office, *id.* ¶ 13, which was subsequently merged with Citywide Fleet Services ("Fleet") at DCAS, *id.* ¶ 45.

After the merger, Plaintiff was an Associate Staff Analyst in Fleet, responsible for data entry related to DCAS's fleet of vehicles.  *Id.* ¶¶ 48-51.  Plaintiff reported to Defendant Steve Weir, Deputy Chief of Fleet, and Defendant Frank Dazzo, Deputy Director of Operations at Fleet.  *Id.* ¶ 46.  At all relevant times, Defendant Keith Kerman was the Chief of Fleet and Deputy Commissioner at DCAS.  *Id.* ¶ 47.

---

[2]     The Court cites to Defendants' 56.1 Statement of Undisputed Facts (Dkt. 59) as "Defs. 56.1 Stmt.," to Plaintiff's 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment (Dkt. 68) as "Pl. 56.1 Stmt.," and to Defendants' Responses to Plaintiff's 56.1 Statement of Undisputed Facts (Dkt. 70) as "Defs. 56.1 Stmt. Response."

Where the facts are undisputed and the Plaintiff explicitly admits in his 56.1 Statement facts stated in Defendants' 56.1 Statement, the Court cites to Plaintiff's 56.1 Statement to reflect Plaintiff's admission to the fact. Likewise, if Defendants admit in their Responses to Plaintiff's 56.1 Statement facts stated in Plaintiff's 56.1 Statement, the Court cites to Defendants' Responses.

**B.  Civil Service List and Section 55-a Status**

**1.  Civil Service List**

Plaintiff was a "pure provisional" Associate Staff Analyst at DCAS, which means he did not have a permanent civil service title.  Pl. 56.1 Stmt. ¶¶ 19, 21.  Following the New York Court of Appeals decision in *City of Long Beach v. Civil Service Employees Association, Inc.*, 8 N.Y. 3d 465 (2007), New York amended Civil Service Law Section 65 ("CSL § 65) to require the City to hire from a list of civil service candidates—generated by a merit examination—if such a list exists for a given position.  *Id.* ¶ 23; *see also* N.Y. Civ. Serv. Law § 65(5).  Put differently, following the change in law, the City can only fill a position with a provisional appointment if there is no civil service list for that position.  In addition, CSL § 65 limits the duration of all provisional appointments, mandates that a civil service exam be given for competitive positions held by provisional employees, and requires that all provisional appointments be terminated within four months following the establishment of a civil service list for a given position.  N.Y. Civ. Serv. Law § 65(2)-(4).  The changes to the law had the effect of prohibiting the permanent hire of a provisional employee in a given position.

As required by the New York State Civil Service Commission, DCAS prepared a plan to come into compliance with New York law regarding provisional appointments.  Pl. 56.1 Stmt. ¶¶ 23-24.  Pursuant to the plan (and the legal requirements), no provisional employee could be hired if there was a civil service list for the position, and all provisional employees were to be terminated once a civil service list had been generated and certified.  Defs. 56.1 Stmt. ¶ 25 (citing Canfield Decl. Ex. G Tr. 56:16-57:10, 58:20-59:16 (Dkt. 62-7)).[3]

---

[3]      Plaintiff notes, however, that the number of provisional appointments at DCAS increased, despite DCAS's plan.  Defs. 56.1 Stmt. Response ¶ 321.

In late 2009, DCAS issued a Notice of Examination for the Associate Staff Analyst position, and the test was scheduled for February 19 or 20, 2010.  Pl. 56.1 Stmt. ¶¶ 27, 29. Applicants could request an alternate test date to accommodate a disability or religious observance.  *Id.* ¶ 28.  Plaintiff met the education and experience requirements and was otherwise qualified to take the Associate Staff Analyst exam, but he neither applied for nor took the exam nor sought an accommodation to take the exam on some other date.[4]  *Id.* ¶¶ 30-31. Plaintiff concedes that he learned in 2010 that his employment was at risk if he did not take the required civil service exam.  Maduegbuna Decl. Ex. 3 Tr. 86:19-87:1.  On March 28, 2012, the civil service list for the Associate Staff Analyst position was established, and it was certified on April 2, 2012; Plaintiff knew the list was certified before he went on medical leave during the summer of 2012.[5]  Pl. 56.1 Stmt. ¶¶ 35-36.

### 2.   Section 55-a Status

Section 55-a of the New York Civil Service Law provides an exception to the normal rule regarding provisional employees.  Section 55-a allows the City to employ individuals who have been certified as mentally or physically disabled on a non-competitive basis in civil service

---

[4]     As with many issues, Plaintiff has a number of excuses for his failure to take the exam necessary for him to keep his job.  In 2009, he was ill when the application was due.  Defs. 56.1 Stmt. Response ¶ 113-14.  In terms of seeking an accommodation to take it on a later date in light of his illness, Plaintiff asserts that he wanted to seek an accommodation but was precluded from doing so by his superiors.  According to Plaintiff, the Deputy Commissioner of Administration stated that Plaintiff would never be selected for a position off of a civil service list so long as he (the Deputy Commissioner) was at DCAS.  Pl. 56.1 Stmt. ¶¶ 118-19.  The evidence cited in Plaintiff's 56.1 Statement—Plaintiff's own deposition testimony—does not support the assertion that anyone ever precluded Plaintiff from seeking an accommodation.  Maduegbuna Decl. Ex. 3 Tr. 88:8-89:2, 90:6-92:8, 94:8-95:2, 97:7-10, 117:7-121:22 (Dkt. 67-3).

[5]     There can be no dispute that Plaintiff was well aware that a list had been certified and that his days as a provision Associate Staff Analyst were numbered.  As established at the very outset of this case, in April 2012, Plaintiff's attorney wrote to the City's attorney asking as part of the settlement of prior litigation, discussed *infra*, that Plaintiff be allowed to take the Civil Service Exam in light of the fact that "DCAS recently certified a list for the position of Associate Staff Analyst."  Decl. of Samuel O. Maduegbuna in Supp. of Pl. Opp. to Defs. Mot. for Sanctions under Fed. R. Civ. P. 11 Ex. 1, at 4 (Dkt. 38-1).  As discussed *infra*, any claim based on the Defendants' rejection of Plaintiff's attorney's request that he belatedly be permitted to take the civil service examination was extinguished in connection with the settlement of the prior litigation.

positions so long as they are otherwise qualified to perform the duties of the position.  Pl. 56.1 Stmt. ¶ 37.  Thus, a qualified person with a disability may be appointed through the Section 55-a program without taking the civil service examination that would otherwise be required.  *Id.* ¶ 39.

The Civil Service Law provides that employees should direct inquiries regarding Section 55-a certification to the Personnel Officer or Section 55-a Coordinator at any City agency or to the Citywide Section 55-a Coordinator.  *Id.* ¶ 42.  Throughout his employment, Plaintiff discussed his interest in the Section 55-a program with a number of supervisors and City employees.  *Id.* ¶ 43; Defs. 56.1 Stmt. Response ¶¶ 233-36, 238, 242, 244-45.  On September 8, 2011 and March 16, 2012, Plaintiff sent letters and medical documentation to the Citywide EEO Coordinator in support of his formal request to be certified for the position of Associate Staff Analyst under Section 55-a.[6]  Pl. 56.1 Stmt. ¶ 44.

### C.  Plaintiff's First Lawsuit

On January 25, 2010, Plaintiff filed a federal lawsuit against the City and certain individual defendants, alleging employment discrimination and a hostile work environment on the basis of race, national origin, and disability and retaliation.  *Id.* ¶ 14.  Plaintiff alleged that the Defendants: (1) failed to reassign him to positions for which he was suited and well-qualified; (2) failed to provide him with a reasonable accommodation for his disability and failed to engage in the interactive process; (3) incessantly harassed and excessively criticized him; and (4) retaliated against him.  *Id.* ¶ 15.

---

[6]     Plaintiff claims that Defendants refused to certify Plaintiff under Section 55-a, but the evidence cited by Plaintiff does not support that assertion—it shows only that Plaintiff received no response to his expressions of interest in the Section 55-a program.  Maduegbuna Decl. Ex. 46 (Dkt. 67-46); *id.* Ex. 3 Tr. 105:1-15, 108:13-109:19, 110:8-111:18, 146:16-150:25, 168:25-176:12, 181:1-183:21, 188:24-190:23, 192:13-196:23, 198:1-25.

On May 3, 2012, the parties executed a settlement agreement that included a waiver and release (collectively, the "Settlement Agreement").  *Id.* ¶ 17.  Defendants paid Plaintiff $600,000 in consideration for dismissing with prejudice

> any and all claims, liabilities and/or causes of action which plaintiff has or may have against any of the Released Parties based on any act, omission, event or occurrence occurring from the beginning of the world up through and including the date hereof, including, without limitation, any and all claims which were or could have been alleged by plaintiff in this action.

*Id.* ¶ 17 (quoting Canfield Decl. Ex. F (Dkt. 62-6)).

### D.  Plaintiff's Attendance

By fall 2011, Plaintiff had been granted a reasonable accommodation in the form of a flexible start time, although he was required to be at work by 11:00 a.m.  Maduegbuna Decl. Exs. 17 (Dkt. 67-17), 18 (Dkt. 67-18), 38 (Dkt. 67-38); Canfield Decl. Ex. AA (Dkt. 62-17).  Plaintiff had trouble getting to work in the mornings because he would still feel the effect of his evening medications.[7]  Maduegbuna Decl. Exs. 17, 26 (Dkt. 67-26), 38.

Notwithstanding the accommodation, while his prior lawsuit was ongoing and after it had been settled, Plaintiff was frequently absent from or late to work.  In the one year period from June 2011 through June 2012, Plaintiff was absent for a total of 512 hours (or roughly three months of work days).  Pl. 56.1 Stmt. ¶ 61.  On March 12, 2012, Kerman put Plaintiff on written notice that in the previous six months, he had fifty-six instances of lateness and unscheduled leave without pay.  *Id.* ¶ 59; Defs. 56.1 Stmt. Response ¶ 164.

The lateness and unexcused absences were an obvious cause for concern for Plaintiff's supervisors.  In March 2012, Kerman's executive assistant expressed discomfort in being asked

---

[7]      Plaintiff claims that he was denied a reasonable accommodation to come into work at 11:30 a.m. and that Weir threatened discipline in response to his request for a more generous accommodation, but the cited evidence does not support those claims.  Pl. 56.1 Stmt. ¶ 213.  There is no evidence that Plaintiff ever requested an accommodation beyond a flexible start time that allowed him to begin work any time in the window from 9:00 a.m. to 11:00 a.m.

to approve Plaintiff's timesheets and leave requests because she was uncertain about the validity of his requests based on purported transit delays. Maduegbuna Decl. Ex. 20, at 3 (Dk. 67-20). In that same email chain, Weir explained his concern to Kerman:

> If we charge him with an AWOL, he is going to go to EEO and say we are not allowing him to deal with emergencies. Then if he is able to document that he had a bona-fide emergency and we denied him the opportunity to address it, he is going to press a lawsuit. We need to be clear what our strategy is.

*Id.* at 1. Kerman responded, "We need to start by documenting the issue and asking him to take steps to improve it." *Id.* Over the following months, Plaintiff continued to be tardy and absent on a regular basis, which was documented. Maduegbuna Decl. Exs. 4 Tr. 283:12-285:8 (Dkt. 67-4), 25 (Dkt. 67-25), 26 (Dkt. 67-26), 32 (Dkt. 67-32); 36 (Dkt. 67-36).

From June 8, 2012 through October 1, 2012, Plaintiff was absent on approved medical leave. Pl. 56.1 Stmt. ¶ 88. Weir issued an AWOL memorandum for Plaintiff covering the dates July 19, 20, and 23, 2012, Defs. 56.1 Stmt. Response ¶ 225, and as of September 24, 2012, Plaintiff had not submitted required FMLA paperwork for leave approval, Canfield Decl. Ex. JJ (Dkt. 62-19). Human resources nevertheless retroactively approved his absence from June 8 through August 30, 2012, as FMLA leave. *Id.* Plaintiff returned to work in early October. Pl. 56.1 Stmt. ¶ 90.

When Plaintiff returned to work, he was unable to log into his computer and various programs. Defs. 56.1 Stmt. Response ¶¶ 278-79. Although he points to this situation as evidence of discrimination by his bosses, in his deposition he acknowledged that logins can automatically expire after a certain period of time. Maduegbuna Decl. Ex. 3 Tr. 184:17-22, 232:15-233:3, 257:21-258:19; *see also id.* Ex. 59 (Dkt. 67-59) (stating in an email while he attempted to regain login access, "Is it possible that my profile expired (or was deleted, maybe changed) due to non-use?").

### E.  Plaintiff's Photocopying

In addition to concerns about Plaintiff's attendance, there were concerns that Plaintiff was wasting time and City resources on personal and unnecessary photocopying.  For example, on May 16, 2012, Kerman observed Plaintiff making a large number of photocopies after Plaintiff's shift had ended.  Defs. 56.1 Stmt. ¶ 64.  When Weir asked Plaintiff to explain what he was doing, Plaintiff said that he was making copies of the work he had done in order to document his work[8] and that he had done so for the eighteen years he had worked for the City.  Canfield Decl. Ex. CC; *id.* Ex. B Tr. 212:1-8, 230:19-231:16 (Dkt. 62-2).  The conversation between Weir and Plaintiff, which took place in Weir's office, did not go well.  When Plaintiff asked for training on a particular function, Weir, who was working on a tight deadline, asked Plaintiff to talk to Dazzo instead, and when Plaintiff persisted, Weir raised his voice and told Plaintiff to leave his office or he would call security to remove him.  Canfield Decl. Ex. CC; Maduegbuna Decl. Ex. 5 Tr. 169:14-170:20 (Dkt. 67-5).

Several other incidents of suspected wasteful activity came to Plaintiff's supervisors' attention.  On May 29, 2012, during the workday, Kerman observed Plaintiff collecting from the photocopier "ten or more copies of self-help books and other private (non-work related) prints from the internet." Maduegbuna Decl. Ex. 36, at 1.  The Director of Fleet noticed "unit by unit printouts on the printer" after he had asked Plaintiff "to help with marking units to be deleted" in the computer system.  *Id.* at 2.  The Director thought the printing was unnecessary inasmuch as the relevant computer system "has audit functionality."[9]  *Id.*

---

[8]    Plaintiff's explanation makes no sense.  His job was to enter data into a computer system.  The best evidence whether he had done his job was, of course, the data that was in the system.

[9]    In addition, Kerman described the situation in a contemporaneous email that Plaintiff had a:

time-consuming and paper wasting practice of making a paper copy of apparently every piece of data he enters into [the Maintenance Control Management System ("MCMS")] and every screen he works with on

## F.  Plaintiff's Complaints of Hostility at the Workplace

After Plaintiff's prior lawsuit settled, his supervisors continued to address his attendance issues and his wasteful use of city resources.  Plaintiff viewed those actions as harassment and hostility.  Plaintiff complained via email to the highest levels in the office, including to Kerman's Chief of Staff, the General Counsel of DCAS, and the DCAS Commissioner's Chief of Staff.  Canfield Decl. Ex. CC at 2, 3; *id.* Ex. DD (Dkt. 62-18).  The General Counsel informed Plaintiff that his email had been forwarded to the DCAS EEO Officer and Deputy General Counsel for Operations.  Canfield Decl. Ex. EE (Dkt. 62-18).  The same day that Plaintiff emailed his concerns to the General Counsel, he reiterated many of his complaints directly to the EEO Officer by separate email.  Canfield Decl. Ex. FF (Dkt. 62-19).  A few days later, the EEO officer responded, *inter alia*, that Plaintiff's concerns about his coworkers and supervisors would be brought to the attention of Kerman, Kerman's Chief of Staff, and human resources.[10]  *Id.* Among other things, Plaintiff complained in these emails to the senior members of his office that: "the hostility of this work is increasing," Canfield Decl. Ex. CC at 2; limited access to Weir impairs his "efficiency and hurts [his] morale, *id.* at 3; he was "accused of not doing a thorough

---

his computer.  I have personally seen reams of paper on his desk that are copies of MCMS and he is constantly at the printer even though he has no work assignments that require this type of copying.

Maduegbuna Decl. Ex. 36, at 1.

[10]     In his May 18, 2012 email to the EEO Officer, Plaintiff referenced an incident that had occurred on an unspecified date between him and Kerman involving an office chair.  Canfield Decl. Ex. FF, at 1.  Kerman acknowledges the incident, although the two have different versions of what happened—one totally innocuous and the other only somewhat less so.  According to Plaintiff, the only time Kerman ever spoke to him, Kerman accused him of stealing Kerman's office chair, even though DCAS had provided Plaintiff with the chair in 2006 after cervical spine surgery.  *Id.*  Plaintiff claims he offered the chair to Kerman, and Kerman responded, "We will see how things work out."  *Id.;* Canfield Decl. Ex. GG (Dkt. 62-19).  In contrast, in his deposition, Plaintiff claims Kerman responded, "We will see who wins in the end."  Maduegbuna Decl. Ex. 3 Tr. 199:8-15.  According to Kerman, the exchange was "civil" and lasted no more than twenty seconds; he asked Plaintiff if he had gotten a new chair, Plaintiff responded that he had had the chair for a while as an accommodation, and Kerman responded "ok."  Canfield Decl. Ex. HH (Dkt. 62-19).

job," Canfield Decl. Ex. DD, at 1; he did "99% data entry," *id.*; and he was subject to "a carousel of retaliatory behavior designed to make [him] quit or end up in the hospital once again," *id.*

On May 31, 2012, in response to a May 30 email from Weir stating that Plaintiff needed to exercise initiative to handle an assignment, Plaintiff took offense and responded with a litany of grievances. Maduegbuna Decl. Ex. 37 (Dkt. 67-37). Weir forwarded Plaintiff's email to Kerman, stating "FYI. I asked him to take some initiative and solve problems concurrent with his civil service title, and I get this. We have to end this." *Id.* at 1. Kerman responded, "Please do not email him at all until we speak on this topic." *Id.*

Plaintiff asserts that various Defendants made discriminatory or hostile statements. For example, Plaintiff testified that he heard Weir say—at some unspecified time and place—"that he doesn't like spics," "that he doesn't like people of Hispanic origin," and "that Colombians, all they do is bring drugs to the United States."[11] Canfield Decl. Ex. B Tr. 176:13-177:6. Plaintiff claims that he orally reported the comments to the EEO Officer.[12] *Id.* Tr. 177:7-13. Plaintiff also testified that—at some unspecified time and place—Dazzo said to him: "you don't come here on time and we have no reason to accommodate you because you don't come here on time." *Id.* Tr. 234:2-13. In May or June 2012, according to Plaintiff, Weir told Plaintiff that "he did not

---

[11]    Plaintiff was not consistent in describing this incident. In addition to the description in text, describing the same incident, he stated that he heard Frank Dazzo and Weir say to each other—somewhere in the Fleet Services Unit in May or June of 2012—that "all Colombians are bringing drugs to this country." Canfield Decl. Ex. B Tr. 225:23-228:12. Another version of the last statement provided by Plaintiff is: "All Colombians have guns which brings drugs to the United States." *Id.* Tr. 178:6-9.

Weir did not know that Plaintiff is Colombian. Canfield Decl. Ex. P Tr. 79:16-24 (Dkt. 62-12). Plaintiff's evidence does not contradict this factual assertion. Pl. 56.1 Stmt. ¶¶ 137-38. Dazzo also did not believe he had known that Plaintiff was Colombian at the time he worked with him. Canfield Decl. Ex. Q Tr. 101:7-21 (Dkt. 62-13).

[12]    Plaintiff also testified that he orally told Weir, Kerman's Chief of Staff, and the EEO Officer that he thought Weir was treating him differently because of his national origin. Maduegbuna Decl. Ex. 3 Tr. 176:13-20.

believe that [plaintiff] was as sick as [plaintiff] pretended to be and . . . [that] he thought [plaintiff] was trying to skate." [13]  *Id.* Tr. 235:2-236:4.

Plaintiff believes that Defendants were looking to terminate his employment for discriminatory reasons.  In addition to Weir's statement to Kerman that "[w]e have to end this," Maduegbuna Decl. Ex. 37, Plaintiff asserts that Weir and Dazzo, at some point between May and October 2012, said that Plaintiff "wouldn't be there for long" and that they "just have to deal with him for a little while," Canfield Decl. Ex. B Tr. 210:15-211:17.  Additionally, according to Plaintiff, Weir told him that Kerman had told Weir that Kerman wanted Plaintiff "out of the unit" and that Plaintiff "was a worthless piece of—equipment."  Maduegbuna Decl. Ex. 3 Tr. 242:7-243:2.  According to the Assistant Commissioner of Human Resources, at some point between May and October 2012, she "possibly" received a request from Fleet to terminate Plaintiff due to his tardiness and absences.  Maduegbuna Decl. Ex. 10 Tr. 41:23-42:8 (Dkt. 67-10).  Kerman does not recall or believe that he requested to terminate Plaintiff during that time period.[14]  Maduegbuna Decl. Ex. 4 Tr. 144:24-145:24.

Plaintiff also testified that others accused him of not doing his work, and the evidence shows that at times he raised similar complaints to various supervisors while employed at Fleet. Canfield Decl. Exs. FF, II (Dkt. 62-19); Maduegbuna Decl. Ex. 3 Tr. 238:12:-239:15.  Plaintiff was never written up or reprimanded formally for failing to perform his duties.  Canfield Decl.

---

[13]    In support of his allegation that he was subject to a hostile work environment, Plaintiff, who had served in the Marines, Defs. 56.1 Stmt. Response ¶ 110, also claims that Kerman took the U.S. Marines photo that had been on Plaintiff's desk, Pl. 56.1 Stmt. ¶ 202, but the evidence cited by Plaintiff does not support the assertion that Kerman removed the photo or even that the photo was on Plaintiff's desk (as opposed to facing the common area), *see* Maduegbuna Decl. Ex. 4. Tr. 187:11-190:23, 282:20-285:12; *id.* Ex. 36.

[14]    Plaintiff also testified that Weir said to him the following in May or June 2012: he was very angry about Plaintiff's first lawsuit, he did not believe Plaintiff should have been paid anything, he was upset that Plaintiff received a six-figure settlement, and he did not believe the individual defendants in the first lawsuit had done anything wrong.  Maduegbuna Decl. Ex 3 Tr. 236:10-237:14.

Ex. B Tr. 211:18-25.  In his deposition, Plaintiff complained that he was denied training necessary to enable him to succeed at his job,[15] Maduegbuna Decl. Ex. 3 Tr. 246:11-248:24, 252:10-255:2, but Plaintiff admits that he was offered training in Excel, Pl. 56.1 Stmt. ¶¶ 54-58. Although he was not always able to complete the training he was offered, whether due to illness or a class cancellation for an insufficient number of participants, there is no evidence that he was denied needed training.[16]  *Id.* ¶¶ 54-58; Canfield Decl. Exs. S (Dkt. 62-15), T (Dkt. 62-15), U (Dkt. 62-15), W (Dkt. 62-16), X (Dkt. 62-16).  In fact, as late as May 23, 2012, the evidence shows that the EEO Officer directed Plaintiff to resources for computer training, but Plaintiff rejected the suggestion because he did not think the available training would be useful to him. Canfield Decl. Ex. GG.

### G.  Plaintiff's Termination

While Plaintiff was out of work on medical leave, in the summer and fall of 2012, DCAS took the steps required to replace its provisional Associate Staff Analysts.  On September 13, 2012, human resources for DCAS notified Fleet that: "[p]rovisional employees serving in the title of Associate Staff Analyst have to be replaced by a probable permanent from the list in this title;" they "ha[d] submitted a request to hire one (1) Associate Staff Analyst who will replace Luis Pena Barrero;" and a list call would be scheduled "to interview candidates for the position being vacated by Mr. Pena Barrero."  Canfield Decl. Ex. PP (Dkt. 62-20).  (A list call is a hiring pool—candidates from the eligible civil service list are called in list order for an interview for a

---

[15]     Plaintiff asserts in his 56.1 Statement that he was denied training in various computer programs, but the evidence he cites does not support his assertion.  Pl. 56.1 Stmt. ¶¶ 177-82 (citing record).  The only statement in Plaintiff's own deposition testimony that at all supports the assertion that Plaintiff was denied training—in contrast with the fact that he did not receive training—is that Weir "told him [he] was not trained because [he] didn't need to know."  Maduegbua Decl. Ex. 3 Tr. 252:13-16.

[16]     Moreover, to the extent Plaintiff claims he was denied training prior to the Settlement Agreement because of discrimination or retaliation, those claims are barred by the Settlement Agreement, as discussed *infra*.

probable permanent appointment title.  Pl. 56.1 Stmt. ¶ 98.)  That same day, human resources

sent a virtually identical email regarding Joann George and Marvin Schneider, two other

provisional Assistant Staff Analysts.  Canfield Decl. Ex. QQ (Dkt. 62-20).  On September 18,

2012, human resources notified hiring managers that the list call for the Associate Staff Analyst

title would take place on October 3, 2012.  Pl. 56.1 Stmt. ¶ 97.

      At around the same time, the New York City Office of Management and Budget

("OMB") required all City agencies to reduce spending.  Specifically, on September 14, 2012,

OMB directed all City agencies to reduce spending in fiscal years 2013 and 2014 due to budget

gaps—also known as the program to eliminate the gap or "PEG."  Pl. 56.1 Stmt. ¶ 95.  Fleet's

portion of DCAS' budget reducing effort was $260,726 for fiscal year 2013 and $397,906 for

fiscal year 2014.  *Id.* ¶ 96.  On September 24, 2012, Kerman notified the DCAS Deputy

Commissioner for Fiscal and Business Management that he would achieve his PEG goals via two

internal attritions in fiscal year 2013—"one mechanic inspector and one analyst (Luis)"—and

one internal attrition in fiscal year 2014—"loss of an ASA due to retirement."[17]  *Id.* ¶ 99;

Canfield Decl. Ex. UU (Dkt. 62-20).

      On September 26, 2012, two days after Kerman submitted his PEG proposal, Fleet

notified human resources that it would not hire from the call list to fill the Associate Staff

Analyst title to be vacated by Plaintiff.  Canfield Decl. Ex. VV (Dkt. 62-21).  Fleet gave up that

position to satisfy its PEG goals.  Canfield Decl. Ex. WW (Dkt. 62-21).  Plaintiff's employment

was terminated on October 5, 2012, without advance notice that October 5 specifically would be

---

[17]     Also on September 24, 2012 but earlier in the day, in response to an email from human resources sharing a
letter that had been sent to Plaintiff regarding his long-overdue FMLA paperwork, Kerman responded, "I believe
there is also an issue with this employee not being on the ASA list."  Defs. 56.1 Stmt. Response ¶ 257.  This was
four days before Plaintiff's doctor cleared him to return to work on October 1, 2012, on a modified schedule.  Pl.
56.1 Stmt. ¶ 89.

his last day.  Canfield Decl. Ex. YY (Dkt. 62-21).  None of the three provisional DCAS

Associate Staff Analysts who had been listed for replacement in Fleet's September 13 emails

continued as a provisional Associate Staff Analyst for DCAS.  On October 18, 2012, provisional

Associate Staff Analyst Joann George submitted her retirement papers, effective November 1,

2012.  Pl. 56.1 Stmt. ¶ 106.  On November 5, 2012, provisional Associate Staff Analyst Marvin

Schneider, who was employed part time by DCAS as Clock Master and who had been appointed

as the Official New York City Clock Master by Mayor Dinkins in 1992, had his title changed to

Clock Repairer.[18]  *Id.* ¶¶ 107-08.  On November 9, 2012, the last provisional Associate Staff

Analyst, Mirlene Delpeche, was terminated effective November 25, 2012.  *Id.* ¶ 105.

Sometime in 2012 or 2013, Kerman hired three new provisional Administrative Staff

Analysts for Fleet.  Defs. 56.1 Stmt. Response ¶ 290.  These employees were not selected from a

civil service list because there was no such list for the Administrative Staff Analyst title at the

time.  *Id.*  ¶ 291.  As of January 15, 2013, the City employed 138 provisional Associate Staff

Analysts, but there is no evidence that DCAS continued to employ any provisional Associate

Staff Analysts after the terminations discussed above.  *Id.* ¶ 322.

## DISCUSSION

### I.   Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

---

[18]      For the uninitiated, the New York City Clock Master keeps, *inter alia*, the mechanical clocks at City Hall
wound.  *See* Christopher Gray, *Streetscapes/Marvin Schneider; The Man Who Makes the City's Clocks Run on
Time*, N.Y. Times (Jan. 24, 1999), http://www.nytimes.com/1999/01/24/realestate/streetscapes-marvin-schneider-
the-man-who-makes-the-city-s-clocks-run-on-time.html.

'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "The Court must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Pandora Media, Inc. v. Am. Soc'y of Composers, Authors and Publishers*, 785 F.3d 73, 77 (2d Cir. 2015) (per curiam) (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)). Nevertheless, "to defeat summary judgment, 'a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 197 n.10 (2d Cir. 2014) (quoting *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005)).

In the context of employment discrimination cases, the Second Circuit has noted that "an extra measure of caution is merited" when considering a motion for summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006). Nonetheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001), and "trial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)). Thus, summary judgment remains available in employment discrimination cases if there is no genuine issue of material fact. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). And, even in the employment discrimination context, a plaintiff must do more than advance conclusory allegations to defeat a motion for summary judgment. *Aspilaire v.*

*Wyeth Pharm.*, Inc., 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citing *Schwapp v. Town of Avon*,

118 F.3d 106, 110 (2d Cir. 1997)).

## II.    The Settlement Agreement Does Not Bar Consideration of Pre-May 3, 2012 Events

Defendants argue that because Plaintiff executed the Settlement Agreement, including the

waiver on May 3, 2012, the actionable allegations in his Complaint are limited to those that

occurred after May 3, 2012, and Plaintiff may not rely in any way on events allegedly occurring

before May 3, 2012, to support his current claims.  Defs. Mem. 2-6; Defs. Reply 1-3.[19]  In

support of their argument, Defendants point to the broad language of the Settlement Agreement

and the doctrine of res judicata.  Defs. Mem. 2-3; Defs. Reply 2-3.  In opposition, Plaintiff

contends that he may rely on events occurring before May 3, 2012, as evidence of discriminatory

or retaliatory intent for claims that arise after May 3, 2012.  Pl. Opp. 9-10.

"[A] dismissal, with prejudice, arising out of a settlement agreement operates as a final

judgment for res judicata purposes."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287 (2d

Cir. 2002).  One of the elements of res judicata is that "the claims asserted in the subsequent

action were, or could have been, raised in the prior action."  *Monahan v. N.Y. City Dep't of*

*Corr.*, 214 F.3d 275, 285 (2d Cir. 2000).  Plaintiff's claims in this lawsuit are based on his

termination and alleged hostile treatment and retaliation that took place after the Settlement

Agreement was executed.  Thus, res judicata does not apply because Plaintiff is now raising

claims that were not and could not have been raised in the prior action.  But, to the extent

Plaintiff attempts to bring claims for alleged discriminatory actions that arose prior to the

---

[19]      The Court cites to Defendants' Memorandum of Law in Support of their Motion for Summary Judgment
(Dkt. 60) as "Defs. Mem.," to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary
Judgment (Dkt. 69) as "Pl. Opp.," to Defendants' Reply Memorandum of Law in Further Support of their Motion
for Summary Judgment (Dkt. 72) as "Defs. Reply," and to Plaintiff's Sur-Reply in Opposition to Defendants'
Motion for Summary Judgment (Dkt. 76) as "Pl. Sur-Reply."

Settlement Agreement and could have been brought at that time, the Settlement Agreement precludes those claims.

"A claim 'arising subsequent to a prior action . . . [is] not barred by res judicata' even if the new claim is 'premised on facts representing a continuance of the same course of conduct.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (quoting *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 383 (2d Cir. 2003)).  As the Supreme Court has explained:

> That both suits involved 'essentially the same course of wrongful conduct' is not decisive.  Such a course of conduct . . . may frequently give rise to more than a single cause of action. . . .While the [prior] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.

*Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955).

Plaintiff essentially alleges that the discriminatory conduct that was the basis for his first lawsuit continued after the Settlement Agreement, resulting in new claims for discrimination, a hostile work environment, and retaliation that did not previously exist.  In addition, although the Settlement Agreement broadly precludes Plaintiff from raising any claims he could have brought up to May 3, 2012, *see* Pl. 56.1 Stmt. ¶ 17, that prohibition does not prohibit Plaintiff from relying on events occurring before May 3, 2012, as evidentiary support for claims arising after May 3, 2012.  Accordingly, neither res judicata nor the Settlement Agreement bars Plaintiff from pointing to pre-settlement events as evidence to support his post-settlement claims.

### III.   Discrimination Based on Race, National Origin, and Disability

#### A.   Plaintiff Has Not Created a Genuine Dispute of Material Fact That He Was Discriminated Against in Violation of Federal and State Law

Plaintiff claims he has been discriminated against on the basis of his race and national origin in violation of 42 U.S.C. §§ 1981[20] and 1983 and NYSHRL and on the basis of his disability in violation of NYSHRL.  Courts analyze Section 1981 and 1983 and NYSHRL claims under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *Camarda v. Selover*, No. 15-3262 (CV), 2016 WL 7234686, at *1 (2d Cir. Dec. 14, 2016) (summary order); *Guzman v. City of N.Y.*, 93 F. Supp. 3d 248, 256 (S.D.N.Y. 2015); *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 251 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for

---

[20]     The Supreme Court previously clarified that, with respect to Defendants who are state actors, Section 1983 is the exclusive remedy for violations of rights guaranteed under Section 1981.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731-34 (1989)  The Second Circuit has not decided whether 42 U.S.C. § 1981(c), an amendment added as part of the Civil Rights Act of 1991, overrules *Jett* and creates a private right of action against state actors under Section 1981.  *See Anderson v. Conboy*, 156 F.3d 167, 169 n.19 (2d Cir. 1998); *Howard v. City of N.Y.*, 602 Fed. App'x 545, 546 n.1 (2d Cir. 2015) (summary order); *see also Underwood v. Roswell Park Cancer Inst.*, No. 15-CV-684-] (FPG), 2017 WL 131740, at *15 n.10 (W.D.N.Y. Jan. 13, 2017).  "In light of the uncertainty in this area, the majority of the district courts have declined to deviate from the Supreme Court's analysis of § 1981 in *Jett*, and have dismissed § 1981 claims which encompass the same substantive right encompassed in the § 1983 claim." *Griffith v. N.Y. State Dep't of Health*, No. 1:14-CV-1128, 2015 WL 4545991, at *3 (N.D.N.Y. July 28, 2015) (citation and quotation marks omitted) (collecting cases).  This Court, however, need not resolve the issue.  "Because § 1981 and § 1983 claims are each analyzed under *McDonnell Douglas* and [the Court] conclude[s] that [Plaintiff's] discrimination [and retaliation] claims fail under this framework, [the Court] need not here decide whether independent recovery for discrimination by state actors is available under § 1981." *Howard v. City of N.Y.*, 602 F. App'x at 547.

unlawful discrimination." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014); *see also Littlejohn v. City of N.Y.*, 795 F.3d 297, 307-08 (2d Cir. 2015).

### 1.   Plaintiff Cannot Establish a Prima Facie Case of Discrimination

To establish a prima facie case of discrimination, a "plaintiff does not need substantial evidence of discriminatory intent." *Littlejohn*, 795 F.3d at 311.  For claims of race and national origin discrimination, if a plaintiff adduces evidence to show:

> (1) that [he] is a member of a protected class, (2) that [he] was qualified for the position [he] sought, (3) that [he] suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation, then [he] has satisfied the prima facie requirements and a presumption of discriminatory intent arises in h[is] favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action.

*Id.*; *see also Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) ("The requirements to establish a prima facie case are minimal . . . and a plaintiff's burden is therefore not onerous." (citation and quotation marks omitted)).  For claims of disability discrimination, a plaintiff makes a prima facie case if he adduces evidence to show that:

> (1) his employer is subject to the [NYSHRL]; (2) he was disabled within the meaning of the [NYSHRL]; (3) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability.

*McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir. 2013); *see also Kemp v. Metro-N. R.R.*, 316 F. App'x 25, 26 (2d Cir. 2009) (summary order) (stating disability claims under the NYSHRL are analyzed using the same standards that apply to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*).  "At this stage, a plaintiff seeking to defeat a defendant's motion for summary judgment would not need evidence sufficient to sustain h[is] ultimate burden of showing discriminatory motivation, but could get by with the benefit of the presumption if [he] has shown evidence of the factors entitling h[im] to the presumption." *Littlejohn*, 795 F.3d at 311.

The parties dispute whether Plaintiff was qualified to continue as an Associate Staff Analyst at the time of his termination inasmuch as he was not on the certified civil service list. With respect to Plaintiff's claims that he was discriminated against on the basis of race and national origin, Plaintiff was "qualified" for the Associate Staff Analyst position if he satisfied the criteria DCAS specified for the position. *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir. 1997). Absent a showing by the Plaintiff that DCAS's job requirements were set in bad faith, the fact finder does not examine the reasonableness *vel non* of the Defendants' employment criteria. *Id.*

At the time of his termination, Plaintiff was not qualified for the Associate Staff Analyst position because he did not satisfy DCAS criteria for the position—namely, having failed to sit for and pass the merit examination, he was not a civil servant. Plaintiff knew at the time the examination was offered that his employment was at risk because he was a provisional employee. Maduegbuna Decl. Ex. 3 Tr. 86:19-87:1. Plaintiff would have been qualified for the Associate Staff Analyst position if he had taken and passed the civil service examination for that position in 2010, which he was eligible to do. Pl. 56.1 Stmt. ¶ 30. Plaintiff attempts to excuse his failure to take or even apply to take the test because he was ill at the time. *Id.* ¶ 113. Plaintiff could have sought an accommodation to take the exam on another date, but he never made arrangements to do so. *Id.* ¶¶ 28, 31. As explained *supra* at note 4, Plaintiff presents no evidence that anyone ever precluded him from seeking an accommodation to take the exam.

Plaintiff also would have been qualified for the Associate Staff Analyst position if he had been certified under Section 55-a of the New York Civil Service Law as mentally disabled but otherwise capable of performing the duties of the position. Although Plaintiff orally and informally expressed interest in Section 55-a certification to various supervisors, *id.* ¶ 43; Defs. 56.1 Stmt. Response ¶¶ 233, 236, 238, 242, 244-45, and made two formal requests by letter to

20

the Citywide EEO Coordinator, Pl. 56.1 Stmt. ¶ 44, there is no evidence that Plaintiff applied for certification to the proper person as required by New York Civil Service Law, *id.* ¶ 42. Plaintiff argues that his expressions of interest in the program were ignored, thus effectively denying him certification. But even if Plaintiff's requests were denied—and the denial was discriminatory—those claims arose prior to the May 3, 2012 Settlement Agreement and are, therefore, precluded.

With respect to Plaintiff's claim that he was discriminated against on the basis of his disability, Plaintiff was "otherwise qualified" for the Associate Staff Analyst position if he "satisfie[d] the requisite skill, experience, education and other job-related requirements of the employment position [he] h[eld] or desire[d]," *Rowe v. AAA W. & Cent. N.Y., Inc.*, No. 515-CV-00063 (LEK) (TWD), 2016 WL 7442656, at *4 (N.D.N.Y. Dec. 27, 2016) (quoting 29 C.F.R. § 1630.2(m)), and if he was able to perform the "fundamental duties" of the position, *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (citation omitted). To determine whether a plaintiff is "otherwise qualified," a court must first determine whether the plaintiff fulfills the position's prerequisites, including the appropriate education, employment experience, skills, or license. *Rowe*, 2016 WL 7442656, at *4; *see also Mark v. Burke Rehab. Hosp.*, No. 94-CV-3596, 1997 WL 189124, at *4 (S.D.N.Y. Apr. 17, 1997) ("According to EEOC guidelines on the ADA, the determination of whether an individual with a disability is qualified should be made in two steps." (quotation marks and citation omitted)).

As just discussed, Plaintiff was not qualified for the Associate Staff Analyst position because he failed to obtain the necessary certification—whether by merit examination or under Section 55-a. *See Kinneary v. City of N.Y.*, 601 F.3d 151, 156-57 (2d Cir. 2010) (plaintiff not qualified for job as boat captain because he did not hold the proper license); *Rowe*, 2016 WL 7442656, at *5-6 (plaintiff not qualified for position because he did not prove that he had passed a required test, even if he otherwise could perform the essential functions of the job); *Dancause*

*v. Mount Morris Cent. Sch. Dist.*, No. 13-CV-6019, 2013 WL 2946063, at *3 (W.D.N.Y. June 14, 2013) (plaintiff not able to perform duties as an English as a Second Language Teacher because she failed to prove she held the professional accreditation required by New York, even though plaintiff was competent to teach the subject), *aff'd*, 590 F. App'x 27 (2d Cir. 2014). Although it is true that an employer cannot "terminat[e] a disabled employee . . . who can perform the essential functions of the job but cannot return to work because the employer has denied his request for a reasonable accommodation," *Kinneary*, 601 F.3d at 156 (citation omitted), Plaintiff has presented no evidence that, after the settlement of his prior lawsuit, he requested an accommodation to take the merit examination or that he properly applied for and was denied Section 55-a status.

In short, Plaintiff has failed to make a prima facie case of race, national origin, or disability discrimination because he has not established that he was qualified for the Associate Staff Analyst position.

### 2.  Plaintiff Has Not Shown Defendants' Legitimate Non-Discriminatory Reasons to Be Pretextual

Even assuming, *arguendo*, Plaintiff has established a prima facie case of discrimination, he has not shown that Defendants' legitimate non-discriminatory reasons for terminating him are pretextual.  Defendants have offered clear evidence that they terminated Plaintiff's employment because they were legally required to replace all provisional Associate Staff Analysts with candidates from the civil service list.  Pl. 56.1 Stmt. ¶¶ 23-24; Canfield Decl. Ex. G., Tr. 56:16-572:10, 58:20-59:16.  There is no dispute that Plaintiff was a provisional employee, Pl. 56.1 Stmt. ¶¶ 19, 21, and that he neither took the civil service examination nor sought an accommodation to take the exam on another date, *id.* ¶¶ 27-31, 113-114, nor obtained Section 55-a status.  In addition, Defendants have adduced evidence that they terminated Plaintiff's

employment as part of a City-wide requirement to reduce spending.  Because DCAS was required to replace Plaintiff with a non-provisional civil servant anyway, DCAS took the opportunity to "kill two birds with one stone:" it partially met its budget reduction goals by eliminating Plaintiff's position in lieu of terminating him and filling his position with someone from the civil service list.  *Id.* ¶¶ 95-96, 99; Canfield Decl. Exs. UU, VV, WW.

Plaintiff has not adduced evidence from which a jury could reasonably conclude that Defendants' explanation for Plaintiff's termination is pretextual.  In an attempt to create a question of fact regarding pretext, Plaintiff argues that: Defendants had been trying to terminate him on account of his attendance issues before they knew he could be terminated based on his provisional status in September 2012; Defendants made discriminatory statements; Defendants made a hodgepodge of statements reflecting frustration with Plaintiff; and one provisional Associate Staff Analyst was not terminated.  Pl. Opp. 13-17.  Plaintiff produces no evidence to support his first argument, and none of his other arguments, taken separately or collectively, creates a genuine dispute of fact as to whether Defendants' proffered reasons for terminating Plaintiff's employment are pretext for discriminatory animus.

Plaintiff was on notice since at least 2010 that his employment as a provisional Associate Staff Analyst was at risk because DCAS was required to replace all provisional Associate Staff Analysts with civil servants.  Maduegbuna Decl. Ex. 3 Tr. 86:19-87:1.  He also knew before he went out on FMLA leave on about June 8, 2012, that the civil service list for the Associate Staff Analyst position had been certified.  Pl. 56.1 Stmt. ¶ 36.  Although there is plenty of evidence that Defendants were concerned about Plaintiff's attendance, there is no evidence that Defendants terminated him because of his absences and tardiness, regardless of whether his poor

attendance was due to his disability.[21]  There is ample evidence that Defendants encouraged

Plaintiff to improve his attendance, an entirely reasonable step for any employee, disabled or not.

Maduegbuna Decl. Ex. 20.  Because Plaintiff had long been granted the reasonable

accommodation to start work at 11:00 a.m., s*ee* Maduegnua Decl. Exs. 17, 18, 38; Canfield Decl.

AA, any argument that Defendants' complaints about Plaintiff's poor attendance are a proxy for

discriminatory animus regarding his disability fails.  *See, e.g.*, *Jackson v. Nor Loch Manor*

*Healthcare Facility*, 297 F. Supp. 2d 633, 636 (W.D.N.Y 2004) (holding an employer is entitled

to discharge an employee for failing to appear for work without notification, even if the absences

are due to a disability).  Moreover, despite his argument to the contrary, as discussed *supra* at

note 7, there is no evidence that Plaintiff sought or was denied the additional accommodation to

arrive at work at 11:30 a.m.   Evidence showing that Defendants were frustrated with Plaintiff's

lack of productivity and reliability does not support an inference that Defendants sought to

terminate him due to his disability, race, or national origin.

Plaintiff points to a myriad of alleged statements in an effort to demonstrate that

Defendants' non-discriminatory reasons for terminating his employment were pretextual.[22]

Specifically, as to race and national origin, Plaintiff testified that he heard Weir say "that he

doesn't like spics," that he doesn't like people of Hispanic origin," "that Colombians, all they do

is bring drugs to the United States,"  and that he heard Dazzo and Weir say to each other that "all

Colombians are bringing drugs to this country."  Canfield Decl. Ex. B Tr. 176:13-177:6, 178:6-9,

---

[21]    The Assistant Commissioner of Human Resources testified at her deposition that, at some point between May and October 2012, she "possibly" received a request from Fleet to terminate Plaintiff due to his tardiness and absences, Maduegbuna Decl. Ex. 10 Tr. 41:23-42:8, but given the speculative nature of the statement and the lack of any other supporting evidence that the request was acted on, this statement does not show that Defendants' proffered reasons for terminating Plaintiff's employment were pretextual.

[22]    In addition to the statements discussed in the text, Plaintiff points to the silly "we'll see who wins in the end" alleged statement by Kerman, *see supra* at note 10.

225:23-228:12.  Because Plaintiff cannot provide any specifics regarding when, where, or in what context Weir made these statements, and because it is undisputed that Dazzo and Weir did not know Plaintiff was Colombian when Plaintiff worked for them, Canfield Decl. Ex. P Tr. 79:16-24; *id.* Ex. Q Tr. 101:7-21, these statements do not suffice to show that Defendants' reasons for terminating Plaintiff were pretext for race or national origin discrimination.  Those alleged statements are the *only* evidence Plaintiff presents that even remotely hint at race or national origin discrimination—*nothing else* in the record does.

As to his disability, Plaintiff points to an alleged statement Dazzo made to him: "You don't come here on time and we have no reason to accommodate you because you don't come here on time," Canfield Decl. Ex. B. Tr. 234:2-13; he also points to an alleged statement by Weir in May or June 2012 that "he did not believe that [plaintiff] was as sick as [plaintiff] pretended to be and . . . [that] he thought [plaintiff] was trying to skate," *id.* Tr. 235:23-25.  Plaintiff does not provide any information regarding time, place, or context for the first statement. Moreover, it is undisputed that Defendants provided Plaintiff with a reasonable accommodation of an 11:00 a.m. start time, Pl. 56.1 Stmt. ¶ 60; Maduegbuna Decl. Exs. 17, 18, 38; Canfield Decl. Ex. AA, and that Plaintiff did not request further accommodation, as discussed *supra* at note 7.  The second statement does not evidence discriminatory animus; it merely shows that Weir believed Plaintiff was malingering.

Plaintiff also argues that the following statements create a question of fact relative to pretext: (1) Weir's statement in response to a long, complaining email from Plaintiff to Kerman: "We have to end this," Maduegbuna Decl. Ex. 37; and (2) a statement by Weir and Dazzo that Plaintiff "wouldn't be there for long" and that they "just have to deal with him for a little while," Canfield Decl. Ex. B Tr. 210:15-211:10.  Even if Defendants were hoping to terminate Plaintiff's employment, these statements do not show that their hope rested on discriminatory animus;

indeed, as described above, it is undisputed that Plaintiff's conduct was a cause for concern in light of his frequent lateness, absences, and unproductive use of City time and equipment. Moreover, although the evidence does not show exactly when Defendants learned that the DCAS's provisional employees would be terminated in fall 2012, the changes to the civil service law were not secret—Plaintiff had been notified in 2010 that his job was in jeopardy if he did get on the civil service list.[23]  Maduegbuna Decl. Ex. 3 Tr. 86:19-87:1.

Finally, Plaintiff argues that Defendants' non-discriminatory reasons are pretextual because at least one provisional Associate Staff Analyst, Schneider, was not terminated. Schneider, however, was in a unique position as Mayor Dinkins had appointed him as the Official New York City Clock Master in 1992, and thus, on November 5, 2012, the City changed his title to Clock Repairer to reflect his true role and responsibilities.  Pl. 56.1 Stmt. ¶¶ 107-08. Neither does the fact that DCAS later hired provisional employees show that Defendants' non-discriminatory reasons are pretextual.  Even if some of the responsibilities of the three provisional employees hired in 2012 or 2013 may have been similar to Plaintiff's responsibilities, they were hired for a different position than the one held by Plaintiff, and it was a position that did not have a civil service list.  Defs. 56.1 Stmt. Response ¶¶ 290-92, 294, 321-22.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's Section 1981 and 1983 claims for race and national origin discrimination and Plaintiff's NYSHRL claims for race, national, origin, and disability discrimination.

---

[23]     For the same reasons, Kerman's alleged statement to Weir that he wanted Plaintiff "out of the unit" and that Plaintiff "was a worthless piece of—equipment," Maduegbuna Decl. Ex. 3 Tr. 242:7-243:2, does not show that Defendants' non-discriminatory rationale for Plaintiff's termination is pretextual.

**B. Plaintiff Has Not Created a Genuine Dispute of Material Fact Regarding Whether Defendants Discriminated Against Him in Violation of NYCHRL**

Plaintiff alleges he has been discriminated against on the basis of his disability in violation of NYCHRL. Although the text of the NYCHRL mirrors the NYSHRL, *compare* N.Y.C. Admin. Code § 8–107 *with* N.Y. Exec. Law § 296, in 2005, the New York City Council broadened the protection of the NYCHRL, *see* Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85. The Second Circuit therefore requires "'courts [to] analyze NYCHRL claims separately and independently from any federal and state law claims.'" *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (per curiam) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).

Under the NYCHRL, claims are construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109 (internal quotation marks and citation omitted). NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14–CV–155 (LGS), 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik*, 715 F.3d at 114). The proper inquiry under the NYCHRL is whether a plaintiff "was treated 'less well' because of her [membership in a protected class]." *Mihalik*, 715 F.3d at 111 (quoting *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 36 (1st Dep't 2009) (alteration omitted)). Although "a jury is often best suited to make this determination, . . . summary judgment still can be an appropriate mechanism for resolving NYCHRL claims." *Id.* A defendant is entitled to summary judgment "if the record establishes as a matter of law that discrimination played *no* role in its actions." *Id.* at 110 n.8 (citing *Williams*, 872 N.Y.S.2d at 840 n.27) (alteration omitted).

"Claims under the NYCHRL are subject to *McDonnell Douglas* burden-shifting."  *Hill v. N.Y. City Hous. Auth.*, No. 15 CIV. 8663 (CM), 2016 WL 6820759, at *8 (S.D.N.Y. Nov. 14, 2016).  Even under NYCHRL's more liberal standards, Plaintiff's race, national origin, and disability discrimination claims fail as a matter of law because Plaintiff has not shown "that the conduct [complained of wa]s caused by a discriminatory motive," even in part.  *Mihalik*, 715 F.3d at 110.  Plaintiff was not treated "less well" than the other provisional Associate Staff Analysts who were also required to be replaced by individuals from the civil service list, Pl. 56.1 Stmt. ¶¶ 105-06, nor was Plaintiff treated "less well" than Schneider, who, although in a unique position, was terminated as a provisional Associate Staff Analyst, *id.* ¶¶ 107-08.  The fact that Defendants were concerned about Plaintiff's attendance and absenteeism after Plaintiff had already been granted a reasonable accommodation—and failed to request additional accommodation—does not raise an issue of fact regarding whether Defendants' proffered reason for Plaintiff's termination was pretext for discrimination.  Moreover, for the reasons provided above, the single incident described by Plaintiff in which Weir and Dazzo made disparaging remarks regarding Hispanics and Colombians also does not raise an issue of fact regarding whether Defendants' proffered reason for Plaintiff's termination was pretext for discrimination. Defendants are, therefore, entitled to summary judgment on Plaintiff's NYCHRL claims for race, national origin, and disability discrimination.  *See Hill*, 2016 WL 6820759, at *8 (granting summary judgment on NYCHRL disability claim because plaintiff failed to rebut defendant's non-discriminatory reason for adverse actions); *Doe v. Major Model Mgmt. Inc.*, No. 11 CIV. 6182 (KBF), 2012 WL 763556, at *10 (S.D.N.Y. Mar. 9, 2012) (same).

IV.     **Hostile Work Environment**

   A.  **Plaintiff Has Failed to Create a Genuine Dispute of Material Fact Regarding Whether He Was Subjected to a Hostile Work Environment in Violation of Federal and State Law**

For a hostile work environment claim, a plaintiff must demonstrate that the conduct complained of "(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected status]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)) (quotations and internal alterations omitted).  The same standard is used for evaluating hostile work environment claims under Section 1981 and 1983 and the NYSHRL.  *See Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011); *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011).  In evaluating hostile work environment claims, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993).  While the Second Circuit has "often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe,'" *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (citing cases), in most cases, "[t]he incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citation omitted).

Plaintiff asserts that the following establish a hostile work environment: (1) Weir threatened to have security escort Plaintiff out of his office; (2) Weir and Dazzo made derogatory statements regarding "spics" and Colombians; (3) Weir said that Plaintiff exaggerated his illness;

(4) Kerman said "we'll see who wins in the end" during a dispute over an office chair; (5)

Kerman blocked Plaintiff's attempts to transfer to a different job while simultaneously trying to

terminate Plaintiff for his poor attendance record; (6) the EEO Officer and General Counsel

worked with Defendants to thwart any investigation of Plaintiff's complaints of harassment and

hostile work environment; and (7) Kerman removed a U.S. Marines photograph that had been

hanging in Plaintiff's general workspace.  Pl. Opp. 25.  Plaintiff has established that he

subjectively perceived his work environment to be hostile; the numerous emails sent to his

various supervisors in May 2012 confirm as much.  Canfield Decl. Exs. CC, DD, FF;

Maduegbuna Decl. Exs. 34, 37.  But perceived hostility is not the same as objective hostility, and

Plaintiff has failed to show that "his work environment was objectively hostile and abusive."

*Richards v. N.Y.C. Dep't of Educ.*, No. 13-CV-16 (VEC), 2015 WL 4164746, at *11 (S.D.N.Y.

July 10, 2015) (citation and quotation marks omitted); *see also Bickerstaff v. Vassar Coll.*, 196

F.3d 435, 456 (2d Cir. 1999) ("[F]eelings and perceptions of being discriminated against are not

evidence of discrimination."), *as amended on denial of reh'g* (Dec. 22, 1999).

Plaintiff has adduced no evidence in support of his fifth through seventh asserted bases

for a hostile work environment claim.  As to his other arguments, a single incident of disparaging

remarks regarding Hispanics and Colombians does not suffice to establish a hostile work

environment on the basis of race or national origin, nor does Weir's comment that he believed

Plaintiff exaggerated his illness suffice to establish a hostile work environment on the basis of

disability.  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments,

slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated

incidents of racial enmity.'" (citation omitted)); s*ee also Kotcher v. Rosa and Sullivan Appliance

Ctr.*, 957 F.2d 59, 62 (2d Cir. 1992) ("The incidents must be repeated and continuous; isolated

acts or occasional episodes will not merit relief." (citation omitted)).  As explained *supra* at note

10, Kerman's alleged "we'll see who wins" statement, purportedly made during an incident involving a desk chair, is contradicted by Plaintiff's own account of the incident at the time, which was that Kerman said "we'll see how things work out."[24]  Moreover, although Weir's threat to have security escort Plaintiff out was, undoubtedly, not Weir's finest moment as a manager, "[a]ntidiscrimination statutes are not general codes of civility and do not provide redress for abusive conduct not occurring because of Plaintiff's membership in a protected class." *Brutus v. Silverseal Corp.*, No. 06 CIV. 15298 (LAP), 2009 WL 4277077, at *5 (S.D.N.Y. Nov. 24, 2009), *aff'd,* 439 F. App'x 28 (2d Cir. 2011).  Even if Plaintiff had demonstrated that his work environment was in some sense hostile—and he has not—for the reasons previously discussed, Plaintiff has not adduced evidence to connect the hostile work environment to his membership in a protected class. *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class.").

> **B.  Plaintiff Has Failed to Create a Genuine Dispute of Material Fact Regarding Whether He Was Subjected to a Hostile Work Environment in Violation of NYCHRL**

As with discrimination claims generally, the NYCHRL permits hostile work environment claims based on a lesser showing than is required by federal or state law. *See Mihalik*, 715 F.3d at 112–13; *Gonzalez v. EVG, Inc.*, 999 N.Y.S. 2d 16, 17 (1st Dep't 2014).  "Under the [NY]CHRL's more liberal standard, a plaintiff must 'show that her employer treated her less well than other similarly situated employees, at least in part for discriminatory reasons.'"  *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12–CV–234 (BMC), 2014 WL 5587349, at *2

---

[24]    In any event, it takes two to get into a dispute over a chair, and this particular dispute—whichever version of Kerman's statement is accurate—does not rise to the level of creating a hostile work environment.

(E.D.N.Y. Nov. 3, 2014) (quoting *Fenner v. News Corp.*, No. 09–CV–9832 (LGS), 2013 WL 6244156, at *13 (S.D.N.Y. Dec. 2, 2013)).

    As discussed *supra*, because Plaintiff has adduced no evidence that Defendants' behavior was motivated by "discriminatory animus," his NYCHRL hostile work environment claim fails. *Askin v. Dep't of Educ. of City of N.Y.*, 973 N.Y.S.2d 629, 630 (1st Dep't 2013).  Even if Plaintiff had established discriminatory animus, he has not put forward evidence that would elevate his claim above "petty slights" and into the realm of cases that are actionable under the NYCHRL.  *See, e.g., Gonzalez,* 999 N.Y.S.2d at 17 (describing defendants' "constant use of language degrading women, telling of sexually explicit jokes, and overt viewing of pornography in the workplace" as hostile under the NYCHRL but not the NYSHRL).

    Because Plaintiff has failed to create a genuine dispute of material fact regarding his hostile work environment claims under Sections 1981 and 1983, NYSHRL, and NYCHRL, Defendants are entitled to summary judgment on those claims.

**V.      Retaliation**

**A.  Plaintiff Has Failed to Create a Genuine Dispute of Material Fact Regarding Whether Defendants Retaliated Against Him in Violation of  Federal and State Law**

    Plaintiff also alleges retaliation under Sections 1981 and 1983, NYSHRL, and NYCHRL. Retaliation claims brought pursuant to NYSHRL and Sections 1981 and 1983 are treated the same, and Courts analyze them under the burden-shifting *McDonnell Douglas* framework.  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see also Guzman v. City of N.Y.*, 93 F. Supp. 3d 248, 261 (S.D.N.Y. 2015).  First, the plaintiff must make out a prima facie case of retaliation.  *Hicks*, 593 F.3d at 164.  To make out a prima facie case, a plaintiff "must demonstrate that '(1) [he] engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected

activity and that adverse action.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *see also Littlejohn*, 795 F.3d at 316.

If the plaintiff makes out a prima facie case, the defendants "must then 'articulate a legitimate, non-retaliatory reason'" for the materially adverse action. *Hicks*, 593 F.3d at 164. (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). Finally, the plaintiff must prove "that 'a retaliatory motive played a part'" in the adverse action. *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). To do so, the plaintiff must "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *see also Shein v. N.Y. City Dep't of Educ.*, No. 15CV4236 (DLC), 2016 WL 676458, at *7 (S.D.N.Y. Feb. 18, 2016) (applying but-for causation to Section 1983 first amendment retaliation claim); *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 221 n.25 (E.D.N.Y. 2014) (applying but-for causation to NYSHRL retaliation claim). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013). In addition, temporal proximity, without more, does not satisfy a plaintiff's burden to bring forward evidence showing that a defendant's proffered reasons for the adverse action are pretextual. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).

The parties dispute whether Plaintiff has established a prima facie case of retaliation. Among other things, the parties dispute whether certain acts qualify as adverse actions and whether Plaintiff has shown a causal connection between the protected activity and those acts. Plaintiff argues that he was subject to a "campaign" of retaliatory actions, including: (1)

terminating Plaintiff without advance notice; (2) disabling his computer logins; (3) refusing to

provide training and purposefully evading his requests for help; (4) refusing to assign him

anything other than basic data entry work; (5) refusing to investigate his EEO complaints; (6)

refusing to consider or process his Section 55-a requests; (7) refusing to extend Plaintiff further

accommodation on his start time; (8) issuing an AWOL memo for three days of absences in July

2012; (9) yelling and threatening to have Plaintiff removed by security; and (10) refusing to

transfer Plaintiff to another position.  Pl. Opp. 19-20.

Other than his termination, however, Plaintiff, either fails to adduce evidence that the

alleged adverse action took place or that his engagement in protected activity was the but-for

cause for the adverse action.[25]  There is no evidence that Plaintiff's computer logins were

intentionally disabled upon his return from approximately four months of leave but only that he

was unable to log in, and Plaintiff concedes that logins expire after a period of time.  Canfield

Decl. Ex. B Tr. 257:21-258:19; Maduegbuna Decl. Ex. 59.  Plaintiff testified that he was denied

training, but he could point to only a single incident when he requested training that was denied,

and he has presented no evidence to refute Defendants' explanation at the time that the training

was not necessary for his job.  Madueguba Decl. Ex. 3 Tr. 246:11-255:2.  Moreover, the

evidence shows that Plaintiff was offered training in Excel on multiple occasions and refused to

take other training because he deemed it not useful.  Pl. 56.1 Stmt. ¶¶ 54-58; Canfield Decl. Exs.

S, T, U, W, X, GG.  Similarly, Plaintiff requested a transfer in part because his assignments were

chiefly data entry, Maduegbuna Decl. Exs. 24, 26, but the Associate Staff Analyst position was

primarily responsible for data entry, *see* Maduegbuna Decl. Ex. 27; Pl. 56.1 Stmt. ¶¶ 48-51.  The

---

[25]     Because Plaintiff either fails to present evidence of the alleged adverse act or fails to causally connect them
to any protected activity, the Court does not address whether these acts qualify as materially adverse for the purpose
of a retaliation claim, which is an issue the parties dispute.

evidence cited by Plaintiff does not demonstrate that Defendants refused to investigate Plaintiff's complaints about harassment and hostility, Maduegbuna Decl. Ex. 7 Tr. 42:6-43:11; on the contrary, the EEO Officer told Plaintiff that his "concerns about relationships with [his] coworkers and supervisors w[ould] be brought to the attention of" upper management at Fleet and human resources, Canfield Decl. Ex. FF, and the DCAS Commissioner's office asked for "a review and report of the matter," Maduegbuna Decl. Ex. 34. As to his Section 55-a requests, as explained above, the Settlement Agreement precludes any claims arising from those requests. Finally, as discussed *supra* at note 7, Plaintiff presents no evidence that he ever actually sought an accommodation to start later than 11:00 a.m.

As to the remaining alleged adverse actions, Plaintiff fails to connect them causally to any protected activity. Weir issued an AWOL memo for Plaintiff for July 19, 20, and 23, 2012 because Plaintiff had not submitted the paperwork necessary for FMLA leave, but human resources—still without the requisite paperwork—retroactively approved Plaintiff's FMLA leave on September 24, 2012. Canfield Decl. Ex. JJ. Weir yelled at and threatened Plaintiff in the context of discussing Plaintiff wasting time and city equipment by making unnecessary photocopies and in the context of Plaintiff insisting on immediate attention when Weir was busy, not in connection to Plaintiff engaging in protected activity. Canfield Decl. Ex. CC; Maduegbuna Decl. Ex. 3 Tr. 230:19-231:16; *id.* Ex. 5 169:14-170:20. Finally, Plaintiff's complaint about Defendants' refusal to transfer Plaintiff to another position also has no causal connection to protected activity. Plaintiff requested a transfer when he was in a snit because his boss refused to excuse a late arrival, explaining to Plaintiff that his data entry assignments are important and consistent with his position. Maduegbuna Decl. Ex. 26. In any event, Plaintiff has presented no evidence that any other employee was transferred out of Fleet, on request of the

employee, because the employee did not want to enter data.  Accordingly, the only remaining adverse action is Plaintiff's termination.

Assuming, without deciding, that Plaintiff has established a prima facie case of retaliation, Defendants have provided legitimate, non-discriminatory reasons for Plaintiff's termination, just as they did in response to Plaintiff's discrimination claims.  As he did for his discrimination claims, Plaintiff argues those reasons are pretextual because Defendants sought to terminate him before they knew about his provisional status and because Kerman later hired new replacement employees.  Pl. Opp. 21-22.  But the Court rejects those arguments for the same reasons they were rejected with respect to Plaintiff's discrimination claims.  In addition, Plaintiff argues Defendants' reasons for Plaintiff's termination are pretextual because Defendants could have chosen to keep Plaintiff, and Defendants did not provide Plaintiff with any warning that he was about to be terminated in order to allow him time to find another job.  *Id.*  The Court rejects these arguments, too.  There is no evidence that Defendants could have kept Plaintiff as a provisional Associate Staff Analyst, unless he had Section 55-a certification, which he did not.  Because Plaintiff was on notice since 2010 that his employment was at risk if he did not take and pass the civil service examination, Maduegbuna Decl. Ex. 3 Tr. 86:19-87:1, and because he knew before taking FMLA leave in June 2012 that a civil service list had been certified for his position, Pl. 56.1 ¶ 36, the fact that Defendants failed to provide Plaintiff with advance warning that October 5, 2012, would be his last day does not establish that retaliation was the but-for cause of Plaintiff's termination.[26]  In any event, although failure to warn an employee that

---

[26]    For the same reason—namely, it was public knowledge at DCAS that provisional employees were legally required to be replaced with candidates from the civil service list—Kerman's alleged statement that he was angry about the settlement of Plaintiff's prior lawsuit, *see supra* note 14, does not establish that Plaintiff's prior lawsuit was the but-for cause of his termination.

termination is imminent may be less than ideal from a human relations perspective, it does not tend to prove that the termination itself was retaliatory.

In sum, Plaintiff has not adduced any evidence to show that Defendants' reasons for terminating him were pretext for retaliation.

### B.  Plaintiff Has Failed to Create a Genuine Dispute of Material Fact Regarding Whether Defendants Retaliated Against Him in Violation of NYCHRL

"As is the case with NYCHRL discrimination claims, NYCHRL retaliation claims are to be construed more broadly than Title VII and NYSHRL retaliation claims." *Goonewardena v. N.Y. State Workers' Comp. Bd.*, No. 09CIV8244 (RA) (HBP), 2016 WL 7439414, at *19 (S.D.N.Y. Feb. 9, 2016) (citing *Mihalik*, 715 F.3d at 112), *report and recommendation adopted sub nom. Goonewardena v. State of N.Y. Workers Comp. Bd.*, No. 09-CV-8244 (RA), 2016 WL 7441695 (S.D.N.Y. Dec. 22, 2016).  "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted).  In analyzing a NYCHRL retaliation claim, "the totality of the circumstances must be considered because 'the overall context in which the challenged conduct occurs cannot be ignored.'" *Id.* at 113 (quoting *Hernandez v. Kaisman*, 957 N.Y.2d 53, 59 (1st Dep't 2012)).  Although the but-for causation standard applicable to state and federal retaliation claims does not apply to NYCHRL, "a plaintiff must still establish that there was a causal connection between her protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for her termination was pretextual or 'motivated at least in part by an impermissible motive.'" *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 456 (E.D.N.Y. 2013) (quoting *Brightman v. Prison Health Serv., Inc.,* 970 N.Y.S.2d 789, 792 (2d Dep't 2013)).

Plaintiff's retaliation claim fails even under the more generous NYCHRL standard. Taking into account the totality of the circumstances, the only evidence of a possible causal connection between Plaintiff's termination and his engagement in protected activity is the five-month period between the settlement of his lawsuit and his termination.  That alone is insufficient to suggest a causal connection.  There is no causal connection between Plaintiff's termination and his lawsuit or any post-settlement protected activity in which he may have engaged because Plaintiff was destined for termination as an Associate Staff Analyst since 2010 when he failed to take or seek an accommodation to take the civil service exam.  Plaintiff settled his prior lawsuit despite the Defendants refusing to include in the Settlement Agreement a provision allowing Plaintiff to take the required civil service exam belatedly.  Decl. of Samuel O. Maduegbuna in Supp. of Pl. Opp. to Defs. Mot. for Sanctions under Fed. R. Civ. P. 11 Ex. 1, at 4.  Having done so, it strains credulity to argue that the very termination that he acknowledged would follow from the fact he had neither taken the civil service test nor obtained Section 55-a certification is retaliatory.  Moreover, the Court's prior analysis concluding that Plaintiff has not adduced evidence that rebuts Defendants' non-discriminatory reasons as pretext likewise applies under the more liberal NYCHRL standard.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claims brought under federal, state, and municipal law.

### C.  Plaintiff Has Failed to Create a Genuine Dispute of Material Fact Regarding Whether Defendants Retaliated Against Him in Violation of the FMLA

Finally, Plaintiff alleges that Defendants terminated him in retaliation for exercising his rights under the FMLA.  The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims brought pursuant to the FMLA.  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016).  In order to make out a prima facie case for FMLA retaliation, the plaintiff must establish that: "1) he exercised rights protected under the FMLA; 2) he was

qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziadio*, 817 F.3d at 429.

As with his other claims that require proof that he was qualified for his position, his FMLA retaliation claim founders on the shoals of the prima facie case because he was not qualified for the position from which he was terminated. But, even if Plaintiff had established a prima facie case, he has not shown that Defendants' proffered explanation that Plaintiff was terminated because of the change in civil service rules and DCAS's PEG goals is pretextual. Plaintiff argues that Defendants' reasons are too vague and are pretextual because Defendants have not demonstrated: (1) why Plaintiff could not be certified under Section 55-a or transferred to a different title; (2) why the City strayed from its practice of advanced notice of termination to provisional employees; and (3) why his computer and voicemail were disabled upon his return from FMLA leave. Pl. Opp. 23.

Defendants have, however provided a "clear and specific" legitimate nondiscriminatory reason for Plaintiff's termination, *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003)— in order to comply with the most recent change in the law, DCAS was required to replace all provisional Associate Staff Analysts with individuals who were on the civil service list. In addition, there is no evidence that Plaintiff was ever denied Section 55-a certification, and any claims arising from his formal requests for Section 55-a certification that were not responded to are barred by the Settlement Agreement. There is no evidence that Plaintiff ever applied for another City job or that failure to provide advance notice of the termination (other than the notice

he received in 2010) had any connection to Plaintiff's use of FMLA leave.  The evidence is also clear that Plaintiff knew his time as a provisional Associate Staff Analyst was soon coming to an end because he knew a civil service list had been certified prior to the time he signed the Settlement Agreement.  Pl. 56.1 Stmt. ¶ 36; Decl. of Samuel O. Maduegbuna in Supp. of Pl. Opp. to Defs. Mot. for Sanctions under Fed. R. Civ. P. 11 Ex. 1, at 4.  For that reason, the fact that Plaintiff was terminated almost immediately after his return from FMLA leave does not rebut Defendants' proffered reason for his termination.  Finally, Plaintiff acknowledges that computer logins can expire after a certain period of time, Canfield Decl. Ex. B Tr. 257:21-258:19—and even wondered at the time his login was disabled whether that was the case, Maduegbuna Decl. Ex. 59—and there is no evidence in the record to suggest that Defendants intentionally denied Plaintiff computer access upon his return from FMLA leave.

Because Plaintiff has failed to establish a prima facie case and to rebut Defendants' non-discriminatory reason for terminating Plaintiff, Defendants are entitled to summary judgment on Plaintiff's FMLA retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment for the Defendants, terminate the open motion at docket entry 58, and close the case.

Date:  March 30, 2017
       New York, New York

VALERIE CAPRONI
United States District Judge